NANNIE M. JOHNSON, Respondent, v. HARTFORD LIFE INSURANCE COMPANY, Appellant.

Kansas City Court of Appeals, June 17, 1912.

1. **LIFE INSURANCE: Illegal Assessments: Abandonment.** An assessment policy was issued to the assured in 1888, and he paid all assessments until May, 1902, when he failed to pay the one levied at that time, or any subsequent ones. He died in 1907. The unpaid assessment was illegal because it was levied to pay losses, which could be paid out of funds in the hands of the insurer, or under its control, applicable to the payment of

such losses. *Held*, that the policy was not forfeited by the failure to pay such illegal assessment.

2. ———: ———: ———. A certificate holder in an assessment company cannot be put in the wrong and subjected to the penalty of forfeiture until he neglects or rejects a lawful demand, and, if the assessment in question was illegal, the insurer is without legal justification in refusing to pay the loss.

3. ———: ———: **Burden of Proof.** Where the policy holder was in good standing up to the time he defaulted in the payment of an assessment, the burden is on the insurer to show affirmatively the existence of facts on which it predicates its right to declare a forfeiture and to prove that the assessment was necessary, was not excessive, and was levied in the manner prescribed in the contract.

4. ———: **Abandonment.** Where a certificate holder in an assessment company fails to pay an assessment, illegally levied, within the period provided for payment and thereafter has no further communication with the insurer, his silence cannot be tortured into acquiescence in the forfeiture of his policy.

**Ellison, J., Dissenting (Separate Opinion).**

Appeal from Henry Circuit Court.—*Hon. C. A. Denton*, Judge.

AFFIRMED. CERTIFIED TO THE SUPREME COURT.

*Jones, Jones, Hocker & Davis, Wash Adams* and *Lewis Sherry* for appellant.

*Fyke & Snider* and *Parks & Son* for respondent.

JOHNSON, J.—In 1888, defendant, a life insurance company incorporated under the laws of Connecticut, issued to James T. Johnson, a citizen of Henry county, an assessment policy in its "Safety Fund Department" by the terms of which it agreed "that ninety days from the receipt by the president or secretary of said company of satisfactory proofs . . . of the death of the herein named member, while this certificate is in force, all the conditions hereof having been conformed to by the member, there shall be due

and payable, out of the aforesaid mortuary fund, and not otherwise, the indemnity of five thousand dollars . . . to his wife, Nannie M. Johnson.''

The assured died in January, 1907, and, claiming the certificate was in force at the time of his death, plaintiff, his widow, brought tl. 3 suit to collect the indemnity therein provided.

The answer pleaded ''that the certificate required the assured to pay periodical assessments; that five years before his death assessment numbered 95 was levied against him for $74.55; that the call was dated May 2, 1902, and became due June 1, with a grace period expiring June 20, that at the request of the assured the time of payment of this assessment was extended to July 5, that payment was not made and in consequence of the default the certificate was forfeited and that the assured acquiesced in the forfeiture and abandoned his membership and certificate.'' The reply was a general denial.

Plaintiff admits that such assessment was levied, that her husband received notice thereof and that he failed to pay it, but she contends the assessment was illegal; that its non-payment did not work a forfeiture of the policy and that her husband did not acquiesce in the forfeiture nor abandon his insurance. A trial of the issues resulted in a verdict and judgment for plaintiff and the cause is here on the appeal of defendant.

In King v. Insurance Co., 133 Mo. App. 612, we had before us a similar policy issued by defendant and, as in the present case, a forfeiture was claimed on account of the failure of the assured to pay an assessment levied shortly before his death. That assessment, numbered 91, fell due in March, 1901, and the plaintiff met the defense of forfeiture with the claim that the assessment on which it was founded was illegal. She prevailed in the circuit court and we affirmed the judgment. The main issues in that case were the

same as those now before us, though our concern then was with an assessment levied in March, 1901, and now is with one levied in May, 1902. Now, as then, the validity of the assessment depends on the solution of questions raised by the policy and practices of defendant in relation to the conduct of its business, particularly that part of the business known as the "Safety Fund Department." We find the evidence in the present record differs in some respects from that considered in the King case. Defendant insists these differences distinguish the two cases in all vital particulars and, therefore, that the opinion in the King case should not be accepted as decisive of this case. We shall consider that contention after stating the facts disclosed by the record in hand.

In 1880 defendant, which, prior to that year had been doing an "old line" insurance business, established its "Safety Fund Department" and, thereafter, and until 1899, issued new policies out of no other department. The safety fund business was conducted on an assessment plan but the members—as they were called—were merely policy holders and had no voice in the management of the business. In 1899, defendant discontinued issuing new policies out of this department and returned to "old line" business. It continued the business accumulated in this department but deaths and lapses have reduced the number of members to one-third the number holding policies when the department ceased taking new business. The plan of the Safety Fund Department was as follows:

At the time of the delivery of each certificate of $1000, the assured paid an admission fee of eight dollars (which went to the soliciting agent as a commission) and a further fee or deposit of ten dollars to be placed in the "Safety Fund." Thereafter, he was required to pay expense dues of three dollars per annum to defray the expenses of conducting the business. Provision was made for the payment of death

losses out of a "Mortuary Fund" raised by assessments levied on the policy holders. The safety and mortuary funds and the management of them by defendant furnish the field of controversy and the relation of their history and their condition at the time of the levy of assesment No. 113 is necessary to a proper understanding of the questions of law argued by counsel. The foundation of the safety fund consisted of the deposits of ten dollars on each certificate of $1000. As fast as they were received defendant turned such deposits over to the Security Company of Hartford who held and administered the fund thus acquired as trustee under the terms of a trust agreement executed December 31, 1879, by the Security Company and defendant. A copy of this agreement was printed on each certificate issued by defendant. Material provisions thereof are as follows:

"Whereas, The party of the first part (defendant) purposes to issue to persons contracting therefor, certificates of membership in a special department of its business to be known as the Safety Fund Department, and in consideration of the sum of ten dollars to be received on each one thousand dollars of the amount of each and every such certificate for the purpose of creating a safety fund, to insert therein sundry agreements with such persons in the following words, to-wit:

"That said company will deposit said sum of ten dollars, when received, with the trustee, named in a contract made with it (of which a copy is printed hereon), as a safety fund in trust for the uses and purposes expressed in said contract; and shall at the expiration of five years from July 1, 1879, if said safety fund shall then amount to three hundred thousand dollars, or whenever thereafter said sum shall be attained, make a semi-annual division of the net interest received therefrom by it, pro rata among all the holders of certificates in force in said department at such

times, who shall have contributed five years prior to the date of any such division their stipulated proportion of said fund, by applying the same to the payment of their future dues and assessments; and that, whenever said fund shall amount to one million dollars, all subsequent receipts therefor shall be divided by the said company in like manner as the interest.''

''Said company further agrees that if at any time, after said fund shall have amounted to three hundred thousand dollars, or after five years from January 1, 1880, if that amount shall not have been attained before that date, it shall fail, by reason of insufficient membership, or, shall neglect if justly and legally due, to pay the maximum indemnity provided for by the terms of any certificate issued in said department, and such certificate shall be presented for payment to said trustee by the legal holder thereof, accompanied by satisfactory evidence, as hereinafter provided, of its failure to pay, after demand upon it within the time herein stipulated for limitation of action then it shall be the duty of said trustee to at once convert said safety fund into money and divide the same (less the reasonable charges and expenses for the management and control of said fund), among all the holders of certificates then in force in said department, or their legal representatives, in the proportion which the amount of each of their certificates shall bear to the amount of the whole number of such certificates in force; and that in such event it shall file with said trustee a correct list, under oath, of the names, residences and amounts of the certificates of all members entitled to participate in such division. The evidence referred to above to be either certification by said insurance company's president or secretary that a claim is justly and legally due and that payment thereof has been demanded and refused, or the duly attested copy of a final judgment obtained thereupon in any court of competent jurisdiction, satisfaction of

which has been neglected or refused for the period of sixty days from its date. . . . ''That, as often as the sum composing such fund shall be in amount sufficient to purchase one thousand dollars, par value, of United States bonds, said trustee shall make investments of such funds therein and register the same in its name as trustee of the safety fund of the said insurance company, and, provided no default by the party of the first part as hereinbefore recited shall occur, shall accumulate said fund and the income thereof (less the reasonable compensation and expenses), for five years from July 1, 1879, or until such time thereafter as said fund shall amount to three hundred thousand dollars, par value, of the bonds purchased for said fund, when the party of the second part will pay over to the party of the first part, semi-annually thereafter, all the further income from said fund (less the accruing and unpaid compensation and expenses) to be by the party of the first part used for the purposes mentioned in the hereinbefore recited agreements: And, unless such default shall occur, will thereafter add to the principal of said fund the deposits thereafter received from the party of the first part, exclusive of the income therefrom, until the whole fund shall amount in such bonds, at their par value, to one million dollars; and in the event of the failure or neglect mentioned in the hereinbefore recited agreements, will convert said fund into money and divide the same in accordance with the hereinbefore recited agreements, as soon as can reasonably be done after the necessary information of the proper persons and their shares shall have been obtained. Said party of the first part hereby agreeing to put the party of the second part in possession of the information required for the making of a proper division thereof as agreed with its certificate holders.''

The safety fund reached its contractual limit of one million dollars sometime before 1899, and one of

the issues contested at the trial and submitted to the jury was whether or not defendant and the trustees had suffered the fund to increase beyond that limit instead of dividing the surplus among the policy holders. On the face of the reports made by defendant to the insurance department of this state, it appears that a surplus was being accumulated in the hands of the trustee and, further, it appears that defendant had accumulated and was maintaining a large reserve fund and also was maintaining a standing mortuary fund.

The report filed December 31, 1900, contains the items:

"Net Safety Funds in Security Company of Hartford, Conn. .......... $1,112,569.14
Reserve on Safety Fund policies ........ 230,220.00
Mortuary Fund held in addition to reserve ......................... 111,495.36"

The report filed December 31, 1901, which was the last report preceding the alleged lapse of the policy in suit showed $1,166,905.02 in the safety fund; $262,257.00 in the "reserve on safety fund policies" and $116,313.59 in "the mortuary and other funds."

These reports show that defendant had built up funds which its contracts with policy holders did not authorize, consisting, at the close of business in 1901, of $166,905.02, surplus in the safety fund, $262,257,000 in the reserve fund and $116,313.59, in the mortuary fund, making a total of $545,475.61. Had the assured, when notified of the call for the 95th assessment, examined this report (and it was open to his examination) he could have reached no other conclusion than that defendant was maintaining and increasing a great reserve fund it has no right to maintain and which greatly exceeded the total of the death losses the 95th assessment was levied to pay.

In other words the report, which was made under oath and filed in pursuance of the insurance laws of

this state, disclosed that the 95th assessment was illegal because it was levied to pay losses which could be paid out of funds in defendant's hands or under its control applicable to the payment of such losses. But it is contended by defendant that its evidence conclusively disproves these solemn statements. It appears from that evidence that there was no surplus in the safety fund and that the apparent excess consisted of the safety fund in its "Woman's Department" and not of a surplus in the fund belonging to the "Men's Department" and that the item "Reserve in Safety Fund Policies" was not what it purported to be but referred to a fund applicable to policies of another class. As to the mortuary fund, that evidence shows that it varied and at the time of the call for the 95th assessment was less than $50,000 but it appears beyond question from the testimony of defendant's president that defendant kept on hand a standing mortuary fund out of which it paid losses promptly without waiting to levy an assessment to pay them, and that assessments were levied, not for the payment of unpaid death claims, but to replenish the mortuary fund. By this practice, policy holders were assessed to pay anticipated death losses before and not after their occurrence.

Returning to the items of excess in the safety fund and reserve on safety fund policies, we hold the evidence of defendant is not conclusive and, to say the least, the verified reports made to the Insurance Department were of sufficient evidentiary potency to raise an issue of fact to go to the jury. On their face these reports are clear and unequivocal. They do not mention a woman's department, and they purport to speak of the two funds under consideration only as funds belonging to the department out of which the policy in suit was issued. The statements in those reports are so radically and importantly antagonistic to the evidence adduced by defendant as to preclude the

thought that an honest mistake might have been made in them. The only permissible conclusion is that defendant either knowingly misstated vital facts in the reports or has distorted them in its evidence. The jury were entitled to accept the reports as veracious and to reject the contradictory evidence.

Taking up the mortuary fund again, we pass to the contention of defendant that its right to maintain a margin in that fund equal to the proceeds of one assessment was adjudicated in a decree entered in the Superior Court of New Haven county, Conn., in the case of Dresser et al. v. Hartford Life Ins. Co. (the present defendant) and others. That was a suit in equity begun in 1906 by thirty-one certificate holders against defendant, the trustee of the safety fund and certain officers of defendant to obtain an accounting and the appointment of a receiver on the ground of mismanagement and intended misappropriation of funds belonging to policy holders. The lower court sustained the demurrer to the petition and on the appeal of plaintiffs to the Superior Court of Errors, the judgment was reversed and the cause remanded for further proceedings. We quote from the opinion:

"The language of the certificate is that 'if at any time it (the insurance company) shall fail by reason of insufficient membership, or shall neglect, if justly and legally due, to pay the maximum indemnity provided for by the terms of any certificate, . . . it shall be the duty of said trustee (the security company) to at once convert said safety fund into money, and divide the same . . . among the holders of certificates then in force. . . .' The plaintiffs claim that by this provision there must be such a division of the safety fund among the certificate holders, when their number becomes so reduced that the aggregate amount of their insurance does not exceed $1,000,000, as would be the case when there were but 1000 holders of certificates at $1000 each. The claim of the insur-

ance company, as stated in paragraph 29 and admitted
by the demurrer, is that, even after the number of
certificate holders are so reduced, it may continue to
collect dues and to make mortuary assessments, unlim-
ited in the average amount, and unrestricted by the
number of certificate holders, and to declare the rights
of certificate holders forfeited who fail to pay such
dues and assessments. If the insurance company may
so continue to levy assessments unlimited in amount, it
is difficult to see when there can be a failure to pay cer-
tificates by reason of insufficient membership, or how
the certificate holders have much protection from the
existence of the so-called safety fund. Which of these
constructions is the correct one depends upon what is
meant by the provision, if the insurance company shall
'fail (to pay the amount of any certificate) by reason
of insufficiency of membership.' Clearly by the word
'fail' is not meant a default in any obligation assumed
by the insurance company. While the company under-
takes to make the assessments (Lawler v. Murphy, 58
Conn. 295, 20 Atl. 457, 8 L. R. A. 113), and to pay the
sum collected, its express agreement is to pay the
amount of certificates from 'the mortuary fund, and
not otherwise.' If, after an assessment for the payment
of the amount due upon a certificate is properly made
and the assessment paid, the amount realized proves
insufficient to pay the indemnity due, the failure is
that of the mortuary fund, and not of the insurance
company, and there can be no such failure of the mort-
uary fund, 'by reason of insufficient membership,' un-
less there is a fixed maximum limit of assessment. The
certificate fixes such a limit. It provides that the pay-
ment of 'mortality calls' to form a 'mortuary fund'
for the payment of 'all indemnity matured by the
deaths of members' are to be levied 'according to the
table of graduated mortality ratios given hereon, and
as further determined by their respective ages, and
the aggregate indemnity at the dates of such deaths

. . .'    In the application, which is by its terms made a part of the contract of insurance, each member agrees to pay 'all mortality calls determined as within set forth.'    Attached to Exhibit B is a table showing the method of determining mortuary calls and the ratios graduated according to ages of certificate holders for assessments against each holder of a $1000 certificate, for the collection of a death loss of $1000.    This method is based upon a minimum outstanding insurance of $1,000,000.    There is no other method provided by the contract, and therefore none for the making of mortality calls after the total amount of outstanding insurance falls below $1,000,000.    It is expressly stated that these ratios will decrease as the total amount of outstanding insurance increases.    There is no suggestion that they can ever be increased.    It must be held that they cannot.    Even if it is doubtful which of the two claimed constructions of the contract should be adopted, the doubt should be resolved in favor of the insured.    [Liverpool & L. & G. Ins. Co. v. Kearney, 180 U. S. 132, 21 Sup. Ct. 326, 45 L. Ed. 460; Fricke v. U. S. Indemnity Co., 78 Conn. 188, 192, 61 Atl. 431.] The demurrer to the first prayer for relief in so far as it applies to that part of the prayer which asks that the certificates be construed as providing that when the amount of the face of outstanding certificates is reduced to $1,000,000 the safety fund is to be distributed among the certificate holders should have been overruled.    Since the contract may be construed as above stated, it should not be reformed as requested.''

The case was remanded to the New Haven County Superior court where a decree was rendered March 23, 1910.    The court found, as we find, that defendant constantly carried a margin or reserve in the mortuary fund and speaking of that practice, said:

"The plaintiffs claimed it was improper and wrongful to accumulate these margins and to carry this balance in said mortuary fund, and claimed that said

balance of margins should be distributed among the outstanding certificate holders.; but it is held that it is proper and reasonable that the company should hold some such fund for the purpose of enabling it to pay losses promptly, but it is not necessary for that purpose that the company should hold more than the amount of one average quarterly assessment for the previous year.   Said fund belongs to the certificate holders and is held in trust for them and the Hartford Life Insurance Company has the right to hold the same to the extent above stated in trust for said certificate holders and for application to the settlement of death claims and said fund should be ultimately distributed in the settlement of death claims as hereinafter provided, before said certificates in accordance with their provisions are extinguished and the safety fund distributed in accord with the judgment of this court.''

It was adjudged that when the amount of the outstanding certificates ''falls to the face amount of one million dollars and the safety fund is distributed among the holders of said certificates the balance, if any, of said mortuary fund remaining in the hands of the Hartford Life Insurance Company, shall be distributed pro rata among the certificate holders whose certificates are outstanding at that time.''

Defendant argues: ''Perhaps it will be urged that this opinion and judgment is no more than persuasive authority.   But, if it is only this, surely it ought to persuade.   It would be little less than abominable if the company was controlled as to the management of these funds by divergent view of numerous different courts, for then neither the company, the insured, their lawyers nor the courts could ever possibly tell what were the company's rights and duties with respect to these funds.   On principles of comity, this court should incline to follow and adopt the rule there laid down. But we submit that the case is something more than

merely persuasive authority. It is the opinion, judgment and decree of the court in which this fund is actually being administered and by the decrees of which the defendant is bound, and the defendant being bound thereby, the rights of the beneficiaries of these funds ought not to be determined by a rule variant from that by which the company is bound to administer the fund. The mortuary fund, which the defendant has maintained, it has been adjudged right and proper for it to maintain by the courts of Connecticut.''

The Superior Court of Errors is a court of last resort for which we entertain the highest respect and we are willing to accord the decision of that court the same effect that would be given it by that court itself if this case were before it for determination. The two cases are not identical in parties, cause of action, or decisive issues. Paintiff was not a party to that suit; there was no question of the forfeiture of her rights involved therein, the issues before us were not considered in that case and there is nothing in the opinion from which we quoted to sustain the contention of defendant that it had a right to maintain a surplus in the mortuary fund. The New Haven County Superior Court is not a court of last resort and its decrees are no more persuasive than would be the decree of a trial court in this state.

Plaintiff stands on entirely different ground from that occupied by the plaintiffs in the Dresser case. This is an action at law and defendant is standing on a forfeiture alleged to have occurred automatically by Johnson's failure to pay an assessment. The law abhors forfeitures and courts will indulge in no presumption to aid them. Under the admission that Johnson was a certificate holder in good standing up to the time he defaulted in the payment of the 95th assessment, the burden was on defendant to show affirmatively the existence of the facts on which it predicated its right to declare a forfeiture. No presumption of

right acting in the levy will be entertained but on the contrary, defendant will be held to prove that the assessment was necessary, was not excessive, and was levied in the manner prescribed in the contract. [Earney v. Modern Woodmen, 79 Mo. App. 385; Agnew v. A. O. U. W., 17 Mo. App. 254; Puschman v. Ins. Co., 92 Mo. App. 640; Hannum v. Waddill, 135 Mo. 153; Stewart v. A. O. U. W., 46 S. W. 579 (Tenn.); 2 Bacon on Benefit Soc. (3 Ed.), sec. 377.] A certificate holder in an assessment company cannot be put in the wrong and subjected to the penalty of forfeiture until he neglects or rejects a lawful demand. If the assessment in question was illegal, defendant was without legal justification in refusing to pay the loss.

Defendant argues it was necessary to maintain a margin in the mortuary fund in order that losses might be paid promptly. That argument might have weight but for two facts: First, the contracts with policy holders expressly provided that assessments for the mortuary fund should be levied only for the payment of losses already matured by death and, in effect, forbade the maintenance of a reserve in that fund and, second, there was no business reason to serve by anticipating the regular method prescribed in the contracts for the payment of the death losses for the reason that the department was not taking new business and continuing members could not complain as long as defendant was observing the terms of their contracts. Doubtless it would be reasonable for a going assessment company *to provide in its contracts with members* for the maintenance of a reserve in the mortuary fund to pay death losses promptly, but it is indefensible for a company retired from active business to levy assessments for such purpose *in violation of the terms of its contracts with members.*"

It matters not how reasonable it might have been to keep on hand a surplus fund. The contract did not permit it and in declaring a forfeiture defendant

elected to stand on the strict letter of the contract and will not be heard to complain of the unreasonableness of its terms. We conclude that the jury were entitled to find from the evidence that the assessment in question was illegally levied and that defendant had on hand in the safety, reserve, and mortuary funds a sufficient fund for the payment of all accrued death claims.

The defense of abandonment we find is not well founded. Johnson did ask for an extension of time which was granted. After the expiration of that period, he had no further communication with defendant and his silence cannot be tortured into acquiescence in the forfeiture. He had no voice in the affairs of the company and, therefore, was not required to protest or appeal to defendant for redress. Nor was it required of him to make a tender of subsequent assessments, if any, that were lawfully levied, for that would have been a vain and useless formality. In the case of Wayland v. Insurance Company, decided at this term, we considered at length the subject of abandonment in such cases and refer to our opinion in that case for a full discussion of the subject.

In conclusion we reaffirm our decision in the King case and apply it here as far as it may be applicable to the present facts.

The judgment is affirmed. *Broaddus, P. J.,* concurs; *Ellison, J.,* dissents in separate opinion.

## DISSENTING OPINION.

ELLISON, J.—The following was prepared as the opinion of the court, but my associates not being satisfied therewith, prepared, in opposition thereto, that part of the opinion on the subject of abandonment, in Wayland v. Western Life Indemnity Co., and rest their decision in this case on what is said by them in that case.

This action is based on a certificate of member-ship and life insurance in an assessment company, is-sued to James T. Johnson on the first of November, 1888, for the sum of five thousand dollars, payable to his wife out of a mortuary fund made up by assess-ment of members. Johnson died on the 15th day of January, 1907. After issuing the certificate, the com-pany changed its name to that of Hartford Life In-surance Company, by which name it is sued. The com-pany refusing to pay the amount of the insurance, this action was instituted by the widow. The company claims that Johnson failed to pay an assessment due in June, 1902, and thereby and by force of the express provisions of the contract, his insurance ceased at that time. It likewise claims that Johnson abandoned the contract and acquiesced in its termination. The widow claims that there was an excess surplus in the mort-uary fund and that the assessment was unnecessary, unauthorized and void, and that a forfeiture could not follow its non-payment. A peremptory instruction to find for defendant was refused and judgment rendered for plaintiff.

The certificate of insurance was issued in con-sideration of Johnson paying certain annual dues and all mortality assessments for the maintenance of a mortuary fund, and dues for the creation of a safety fund. The payments of mortality calls, or assessments, were to be made quarterly, on the first day of March, June, September and December of each year. Thirty days' notice of each assessment was to be given the assured, and it was agreed that the certificate was is-sued on "the express condition that if either the an-nual dues, mortality calls, or safety fund deposit, are not paid to said company on the day due, then this certificate shall be null and void and of no effect, and no person shall be entitled to damages or the recovery of any moneys paid for protection while the certificate

was in force, either from the company or the trustee of the safety fund. And a failure to make the stipulated payments shall absolutely terminate the member's liability therefor.''

There were also stipulations contemplating applications for reinstatement by the member who had lapsed.

It was further stipulated that the following part of the application was made a part of the contract: ''If I or my representatives shall omit or neglect to make any payment as required, in respect of amount, place and time of payment, by the condition of such certificate, then the certificate to be issued hereon shall be null and void, and all moneys paid thereon shall be forfeited to said company.''

Johnson paid his dues and all quarterly assessments from his entrance as a member in 1888, until that due the first day of June, 1902, a period of near fourteen years. He received proper notice of the June assessment of $74.55, but failed to pay. But it appears that the notice sent to Johnson complying with the contract in that respect, had a statement at the close thereof that if payment of the assessment due the first of June was not received at the home office by the 5th of June, a second notice would be sent by registered letter, giving until June 20th to make the payment. It is then stated that: ''After June 20th, the limit allowed for payment under the registered notice, the company reserves the right to require a medical examination as a condition of reinstatement.'' This second notice was sent to Johnson giving him until the 20th of June. He paid no attention to it until the 19th, one day before the limit would expire and too late to get the payment to the home office in time. Then his son Garland wrote the following letter (which he afterwards approved) to the company: ''My father and I both have been out of town and did not get to attend to payment due on policy 109854, Hartford

Life & Annuity Insurance Co., on life of Jas. T. John-
son. I see our time expires tomorrow. What steps
can we take now to make payment and have it rein-
stated. Father is in perfect health. I am very sorry
indeed for the delay, but it could not possibly be
avoided. Kindly let us know by return mail.''

In due course, June 24, the company answered
this letter, again extending the time, until July 5th.
It reads: ''As you wrote us before the last day of
grace expired for payment of the June call, policy
No. 109854, we are warranted in extending the time of
payment, and have given you until July 5th to renew
the policy. If, therefore, you wish to remit us $75.55
on or before that date, the policy will be kept in
force.''

But again Johnson failed to pay and neither he
nor the company had any further correspondence. Re-
lations between them there ended and nothing con-
nected therewith transpired until subsequent to his
death, near five years thereafter. He had been in reg-
ular receipt of semi-annual dividends on his certificate
down to three months before his default. Though
payment of dividends to him thereafter ceased and
though no further assessments were ever made against
him, he never uttered a complaint nor gave a sign that
he considered himself any longer a member of the
company, or connected with it, contractually or other-
wise. Is it not manifest to any reasonable man that
Johnson considered his connection with the company
had ceased? He knew (his contract so informed him)
that the whole scheme of insurance which he had been
enjoying for fourteen years by paying each year his
quarterly assessment, was based upon assessments of
members scattered throughout the country; that each
one's security—the payment of the insurance to each
one's beneficiary—depended upon the payment by the
others of their assessments. And he must necessarily
have regarded his ceasing to pay, as ending his con-

nection with the company.  And such is the law; it
is the law even though the assessment which was not
paid was not authorized by the contract, for that can-
not control the effect of an abandonment.  [Mutual
Life Ins. Co. v. Hill, 193 U. S. 551; Mutual Life Ins.
Co. v. Phinney, 178 U. S. 328; Mutual Life Ins. Co. v.
Sears, 178 U. S. 345; Ryan v. Mutual Reserve Fund,
96 Fed. 796; Smith v. New England Mut. L. Ins. Co.,
63 Fed. 769; McDonald v. Grand Lodge, 21 Ky. Law,
883; Lone v. Mutual Life Ins. Co., 33 Wash. 577.]
In the cases cited from the Supreme Court of the
United States the opinions are by Justice BREWER.
In the first of these, according to the statement of
facts, at page 551, the assured took out insurance and
paid one premium.  Notice of the second one was
given, and he failed to pay. He was not asked, nor
did he pay, any succeeding premiums for four years,
when he died.  The plaintiff in that case relied upon
the fact that no notice of forfeiture was given.  On
the other hand, "the defendant relied upon the non-
payment of the premiums other than the first, and an
abandonment of the contract." The defendant was a
resident corporation of the state of New York, while
the assured resided in the state of Washington and
took his insurance there.  The laws of the state of
New York required a notice of forfeiture to be given
the assured before one could be effected.  The court
held that even though the New York law applied and
a forfeiture could not be taken without giving notice
to that effect, yet the assured had abandoned the con-
tract by his continued failure to pay the annual pre-
miums.  At page 559 of the report, it is said that:
"Courts have always set their faces against an insur-
ance company which, having received its premiums,
has sought by technical defenses to avoid payment,
and in like manner should they set their faces against
an effort to exact payment from an insurance com-
pany when the premiums have deliberately been left

Johnson v. Insurance Co.

unpaid." The court then cites and approves Lone v. Ins. Co., supra.

In the latter case the assured paid one premium and lived twelve years without paying any more, and, as in the former, his representatives contended that thirty days' notice of forfeiture should have been given as required by the New York statute. The court held that though that were true, yet the assured had acquiesced in the company's position, paid no further premiums and could not recover. In the course of the opinion it is said that: "We are satisfied that the thought never occurred to Rex (the assured) during his life time that he had a claim against the company on the policy which had been issued so many years before, or, if he did, after the lapse of any appreciable time, it was a dishonest thought, for he knew that he had not performed the duties which devolved upon him under the contract, and that he had no rights thereunder; and there seems to be no just reason why his administrator should demand rights which he had virtually waived."

In McDonald v. Grand Lodge, supra, an assessment company, in 1882, issued a certificate of insurance on the life of McDonald payable to his wife as beneficiary. In January, 1886, he surreptitiously left home and his wife paid the assessments called for between January and October. But at the latter month the company refused to receive future assessments and notified her of his suspension and failed to notify her of any subsequent assessments. Nine years thereafter McDonald died and the beneficiary brought an action on the certificate. The court held that having acquiesced in the suspension, without further effort, for nine years, the claim could not be asserted.

In Mutual Life Ins. Co. v. Phinney, supra, the assured paid the first year's premium and failed to pay for two years, when he died. A short time before the second premium became due, he said he could not

pay and asked the agent if he would take his note for it. This was refused. Four weeks afterwards and after the premium was due, he informed the agent that he had the money and could pay. The agent informed him that now, he would have to get a certificate of health. The assured said he could not, as he had been rejected by another company. A few months afterwards the agent requested the assured to let him have the policy to use in canvassing. The assured, remarking that it had lapsed, gave it to him. The assured died in less than two years and it was held that he had abandoned the contract.

In Smith v. New England Mut. L. Ins. Co., supra, the policy was dated May 24, 1890, and the assured paid the two first annual premiums. The question was whether he paid the third, due in 1892, or was excused from doing it. He died November 22, 1893. The company treated him as in default for failure to pay and refused a subsequent offer to pay, because, as it claimed, the policy had lapsed. Nothing further transpired, and he died in less than two years. His widow was allowed to recover the paid-up value of the policy, under the provisions of a statute, but was denied the right to a judgment for the amount insured, on the ground of his acquiescence in the lapsing of the policy. The court said: ''The assured acquiesced in the company's position—that his policy had lapsed—and accordingly neither paid nor tendered subsequent premiums, but treated the policy as a security simply for the interest acquired under the statute. Had his life been continued the claim now made would never have been urged or thought of; his early death alone suggested it. Had he lived ten years longer without payment or tender, this claim would then have been as reasonable as it is now.''

In Ryan v. Mutual Reserve Fund, supra, the assured took out a benefit certificate in 1886 and paid his assessments until February, 1898. On the 26th of

March, 1898, he wrote the company he would not pay that assessment because of its increased amount, and would "quit." In less than six months thereafter he died. The court held that notwithstanding the company had no right to increase the assessment, yet he abandoned the contract instead of contesting the assessment. That there were two modes of action open to him, to contest the assessment he considered to be illegal and unjust or to abandon the contract, and that he chose the latter. The court, in this connection, said, "the case is not one wherein the company is seeking, after the death of the insured party, to establish a right to declare the contract of insurance forfeited by reason of a failure to meet some of its requirements; but the question is whether the insured did not, during his life time, affirmatively put an end to the contract, so that it had, by his action, been terminated before his death."

The question has arisen in the courts of this State and has been answered in harmony with the foregoing cases. [Glardon v. Supreme Lodge K. of P., 50 Mo. App. 45; Miller v. Grand Lodge, 72 Mo. App. 499; Lavin v. Grand Lodge A. O. U. W., 112 Mo. App. 1; Bange v. Supreme Council Legion of Honor, 128 Mo. App. 461; McGeehan v. Ins. Co., 131 Mo. App. 417.] In the first of these there was a void expulsion and forfeiture. The member failed to pay an assessment of July 1, 1882, and died in less than two years. In his life time he made no objection and took no steps questioning the act, and it was held that he acquiesced and the beneficiary could not recover. It was stated in the opinion (page 57 of the report) that an expelled member *owed a duty to his fellow members* to at least make known his objection to the measures taken against him. That the rights of a member are only contractual rights and his being illegally cut off from membership is no more than a breach of contract which the member may, at his election, affirm or disaffirm. It was

stated (pp. 58, 59) that a member cannot rest indefinitely under his illegal treatment without making protest, and if he does, he disables his beneficiaries to deny acquiescence and recover against the company a sum the paying members must satisfy. It was also said (p. 59) that certificates of insurance, like in that case, involved a scheme of mutual insurance (and so does the one in this controversy) under which the living members contribute a certain sum to make up a fund for the benefit of the widow and children, or other beneficiary, of a deceased brother. The court, speaking through Judge Thompson, said (p. 59) that: ''There is an obvious injustice in requiring them to make a contribution to pay such a benefit to the family of a deceased member, who has for a long time ceased himself to make any contribution on his part; and this is so, although he may have ceased in consequence of a void suspension or expulsion, which he has taken no steps to resist or disaffirm, but in which he has passively acquiesced. We take the just rule to be that, even in the case of a void expulsion or suspension, the expelled or suspended member is under a duty to his co-contributors to affirm or disaffirm the act of expulsion or suspension within a reasonable time, and in some distinct manner under the circumstances; and that where he takes no steps of any kind to secure his reinstatement, allows dues which had accrued and were payable *prior* to the date of his expulsion to remain unpaid, and neither tenders such dues nor any subsequently accruing dues, he must be taken to have acquiesced in and consented to the sentence of expulsion or suspension.''

In the second of the last cited cases the same rule is stated by Judge Bond.

In the third of the last cited cases, Judge Goode, writing the opinion for the St. Louis Court of Appeals, approved of the cases to which we have just referred. The facts were that a member took his certificate of

insurance in 1899. He failed to pay the assessment for September, 1900, and died in about ten months thereafter. He was suspended upon his failure to pay, and to the day of his death did not pay, or offer to pay, any monthly assessments; nor did he take any steps to question his suspension or to show his dissatisfaction therewith. It was said (p. 14) that: "It was incumbent on "a member of a benefit society, when unlawfully suspended or expelled, to act thereafter as a member, if he wished to enjoy the rights and privileges of one; that he might not behave as though the rules of the order were no longer binding on him, perform none of his duties, pay none of his dues and assessments, and still retain the same privileges and benefits he would enjoy if he was carrying his share of the society's burdens. A suspended member must either acquiesce in his suspension or protest against it—must keep his insurance *cum onere.* If he does not protest formally and by words, he must treat his membership as still subsisting, not alone for the purpose of giving rights, but for the purpose, as well, of imposing burdens. He cannot elect to regard it as at an end, so far as the obligation to pay dues and assessments and comply with the other rules of the order is concerned, but in existence as far as his certificate of insurance is concerned. He must treat himself as in the order for all purposes or as out of it."

In the fourth case, the rule was again stated by the St. Louis Court of Appeals in the following language, at page 475 of the report; "It is the doctrine of this court, as well as of the tribunals of other jurisdictions, that by remaining silent after he is notified of a void expulsion or suspension, a member of a fraternal society will forfeit his rights in the society, including his insurance. This is because the existence of such associations depends on the prompt payment of dues, and they would be destroyed if members were allowed, after a suspension technically invalid, to re-

tain their insurance without paying assessments.  As has been pointed out in other opinions such a rule would put a suspended member on a better footing than an active one, because the former would continue to enjoy his insurance without paying for it; whereas the latter would pay.  Bange died in March, 1905, four or five months after his suspension and seven months after he had paid any dues.  If he received notice of the action of the council and did nothing if the premises, nor treated himself as a member of the order and bound to contribute to its burdens no recovery can be had on his benefit certificate.''

The last of these cases arose in this court.  It there appears that the assured had a New York policy of insurance issued to him in that state while he was a resident thereof, on which he paid premiums from 1883 to 1895, when he ceased further payments for a period of eight years.  It was the law of New York that there could not be a forfeiture of a policy without first giving thirty days' notice of the intended forfeiture, and as this was not done it was contended that the policy was a subsisting obligation and that the assured was entitled to the amount insured less the premimums he had not paid.  But it was held that notwithstanding the provision as to forfeiture, the fact that the assured ceased to pay premiums for a period of eight years, showed an abandonment.  We said that: ''It must be conceded that so far as plaintiff's rights are concerned he was at liberty to abandon and rescind the contract.  He did not merely neglect a single payment of premium, nor several, but he abandoned all pretense of recognition of the contract for a long series of years.  There is no law nor policy to prevent him, defendant consenting thereto, from giving up his contract.''

Furthermore, the propriety and justness of the rule, thus repeatedly announced, having recently received the endorsement of the Supreme Court of this

state, is not open for further discussion. [Konta v. St. Louis Stock Exchange, 189 Mo. 26.] That case involved the right of membership of one claiming to be a member of a stock exchange, whose place had been forfeited and he expelled for alleged non-payment of dues. At page 39 of the report, the court said: "But even assuming, as contended by plaintiff, that Mr. Konta was a member of the St. Louis Stock Exchange, and that his expulsion was undoubtedly illegal, as it certainly was if he was ever a member of the exchange, he was bound, within a reasonable time after obtaining knowledge of such expulsion, to assert his rights; otherwise, he will be deemed to have consented to such expulsion, however illegal or irregular it may have been."

The court then proceeded to approve Glardon v. Supreme Lodge Knights of Pythias, supra, and then added that:

"In this case plaintiff ascertained through his agent, Mr. Ten Broek, in April or May, 1901, that he had been expelled from the St. Louis Stock Exchange for non-payment of dues. He had allowed dues to accrue which were payable on January 1, 1900, July 1, 1900, and January 1, 1901. He has at no time tendered these dues, nor any dues which accrued subsequently and prior to the institution of this suit, to-wit, dues payable July 1, 1901, and January 1, 1902. Nor did he take any steps whatever to set aside his alleged illegal expulsion until June 9, 1902."

Let it be conceded that an assessment insurance company conducts its business by irregular and illegal methods, and in addition to that, illegally suspends a member and forfeits or terminates his policy. Does it follow that the member is to receive *free* insurance during his life? If the insurance on the life of a man is wrongfully terminated by the company when he is twenty-five years old, and he lives to the age of seventy five, may he pay no more and, without protest, sit idly

by during the intervening fifty years, insured all the while, and leave a live policy at his death? If. he may for five years, as in this case, he may for fifty, as in the supposed case. New members come into these associations and old ones go out by death, lapses, etc. The new ones come in on the faith of the liabilities and present business appearance of the company. Can a member be permitted to allow the termination of his policy to continue without protest, or objection in any form, thereby inducing persons to become members on the faith that he has no prospective claim on the company, and yet his representative, years afterwards, compel these members to pay the policy the same as if nothing had occurred? The deceased was a physician—a man of intelligence—he knew the basis upon which the company was founded, its mode of insurance and manner of collecting funds to pay death losses. He knew that he was dropped from membership of the company, and never asked for reinstatement. It was his duty to act in accord with the natural thought and bent of any resonable man, and have taken some step in opposition to this action, if he meant to look upon the insurance as a subsisting contract. Not having done so, it is inconceivable that he considered himself connected with the company at the time of his death.

Plaintiff has found no way to meet the foregoing suggestions except by the bare assertion that Doctor Johnson had a right to remain passive; and further, that acquiescence or abandonment was not pleaded and that no instructions were asked on that head. We have already shown that, in the circumstances here involved, passivity is acquiescence. The answer of defendant does especially plead the acquiescence of Johnson for five years up to his death. There was no dispute in the evidence on this point and the defendant asked the only instruction it could ask consistently with the law as we have stated it, and that was a per-

emptory direction to the jury that plaintiff had not made a case on the evidence and could not recover. This the court refused, and, I think, erred in so doing.

I deem the decision of the majority in conflict with Konta v. St. Louis Stock Exchange, 189 Mo. 26; and the following decisions of the St. Louis Court of Appeals: Glardon v. Supreme Lodge K. of P., 50 Mo. App. 45; Miller v. Grand Lodge, 72 Mo. App. 499; Lavin v. Grand Lodge A. O. U. W., 112 Mo. App. 1; Bange v. Supreme Council Legion of Honor, 128 Mo. App. 461. The case should therefore be transferred to the Supreme Court for final determination.